PITTSBURG & C. R. CO. (BALTIMORE v.). See Case No. 827.

PITTSBURG, FT. W. & C. R. CO. (KNOWLES v.). See Case No. 7,899.

PITTSBURGH, The (KELLY v.). See Case No. 7,674.

PITTSBURGH (OEBRICKE v.). See Case No. 10,442.

PITTSBURGH (OELRICH v.). See Case No. 10,442.

PITTSBURGH (ROCKMUHL v.). See Case No. 11,982.

---

## Case No. 11,197.

PITTSBURG, C. & ST. L. RY. CO. v. COLUMBUS, C. & I. C. RY. CO. et al.

[8 Biss. 456.] [1]

Circuit Court, D. Indiana. April, 1879.

POWER OF RAILROAD CORPORATIONS IN INDIANA TO EXECUTE LEASES—PLACE OF EXECUTION—POWER TO LEASE RAILROADS IN OHIO—EVICTION—MORTGAGE—DECREE OF SALE—STIPULATION IN LEASE—CLASSIFICATION OF RAILROAD INDEBTEDNESS — TIME OF PERFORMANCE—RESCISSION OF CONTRACT—CONSTRUCTION OF CONTRACTS.

1. There being no statute in Indiana which in terms forbids or prohibits railroad corporations of that state from executing leases of their property, a lease made by such a corporation, and which is neither in violation of any statute, nor against the public policy of the state, is valid.

2. The laws of Indiana, and the decisions in that state bearing upon this point, considered.

3. One of the defendant corporations—a corporation of the state of Indiana—leased its lines to the plaintiff—a corporation of the state of Ohio. The lease was made for the purpose of forming a connecting line of travel and traffic: *Held*, that such lease was not in contravention

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

of the statutes or public policy of Indiana. and that the lessor corporation had power to execute it.

4. It is not essential to the validity of such a lease, (in the absence of express statutory provision,) that its original execution or subsequent ratification should have been evidenced by corporate action taken by the lessor within the limits of the state by which it is created.

5. The lessee corporation was not forbidden by the laws of Ohio to take the lease in question. of the road in Indiana.

6. An unexecuted decree, for the sale of a portion of the demised railroad, for the purpose of satisfying a mortgage made prior to the lease. is not such an eviction of the lessee, by paramount title, as to terminate the lease.

[Cited in Moran v. Pittsburgh, C. & St. L. Ry. Co., 32 Fed. 888.]

7. So, also, the appointment of receivers for the lessor corporation, but with instructions not to disturb the possession of the lessee, is not an eviction.

8. A stipulation by the lessor corporation to arrange. provide for. adjust and classify its indebtedness, was *held* to be one of substance which it must perform.

9. And the lessee is not bound to wait for an indefinite or an unreasonable time for such arrangement, adjustment and classification of the lessor's indebtedness, to be effected.

10. But in such case, where the lessee has acted under the lease before such arrangement and classification has been made, the court will not decree a rescission of the contract upon the application of such lessee, until the lessor is given a reasonable time within which to comply with the stipulation; especially, where by the frame of its bill of complaint, the lessee has prayed for a rescission, unless the lessor shall specifically perform within a reasonable time to be fixed by the court.

11. In this case the court considered that eight months from the date of the order would be a reasonable time within which the lessor should carry out the agreement.

12. Contracts, when their meaning is not clear, are to be construed in the light of the circumstances surrounding the parties when they were made, and the practical interpretation which they by their conduct have given to the provisions in controversy.

Bill to cancel and set aside lease of railroad.

Stanley Matthews, Baker. Hord & Hendricks. and John Scott, for complainant.

Evarts, Southmayd & Choate. Hoadly, Johnson & Colston, and McDonald & Butler. for defendant.

HARLAN. Circuit Justice. The more important facts out of which this litigation has arisen. are as follows: The complainant, the Pittsburg, Cincinnati and St. Louis Railway Company, an Ohio corporation. was formed in 1856 by the consolidation of the Steubenville and Indiana Railroad Company, an Ohio corporation—the Holiday's Cove Railroad Company, a West Virginia corporation—and the Pan-Handle Railway Company, a Pennsylvania corporation. At the date of the lease hereafter referred to, it operated a continuous line of railroad from Pittsburg, via Steubenville, to Columbus. Ohio.

The history of the organization of the defendant corporation, the Columbus, Chicago and Indiana Central Railway Company, is as follows: The Columbus and Indianapolis Central Railway Company was formed in 1864, by articles of consolidation between the Columbus and Indianapolis Railroad Company, an Ohio corporation. and the Indiana Central Railway Company, an Indiana corporation—the consolidated company operating a line of railroad extending from Columbus to Union City. on the state line between Ohio and Indiana, with a branch from the main line, in Miami county. Ohio, to the Indiana state line, where the track of the Indiana Central Railway touches the same, through Richmond to Indianapolis.

The Columbus and Indiana Central Railway Company was formed by a consolidation of the Columbus and Indianapolis Central Railway Company and the Union and Logansport Railway Company, an Indiana corporation, whose line extended from Union City to Logansport, and the Toledo, Logansport and Burlington Railway Company, an Indiana corporation, whose line extended from Logansport to the west state line of Indiana.

The Chicago and Great Eastern Railway Company, an Indiana corporation, was consolidated in 1863 with the Galena and Illinois River Railroad Company, the consolidated company retaining the former name. The latter was subsequently consolidated with the Chicago and Cincinnati Railroad Company, an Indiana corporation, retaining the name of the Chicago and Great Eastern Railway, and the company last named, in 1865, consolidated with the Cincinnati and Chicago Air Line Railroad Company, an Indiana corporation, whose line extended from Richmond to Logansport. The company last formed by consolidation retained the name of the Chicago and Great Eastern Railway Company, owning and operating, as an Indiana corporation, the line from Richmond through Logansport to the Illinois state line, and as a corporation in Illinois, the line from that point to Chicago.

Finally, in December, 1867, the Columbus and Indiana Central Railway Company, and the Chicago and Great Eastern Railway Company (last named). consolidated and became the Columbus, Chicago and Indiana Central Railway Company, owning and operating lines of railroad extending from Columbus to the Indiana state line, four miles east of Richmond, from Union City to the junction of the main line, from Union City to Logansport, from Logansport to the Illinois state line, from the Ohio and Indiana state line, four miles east of Richmond, through that city to Logansport, and from Richmond to Indianapolis, and from a point on the eastern line of Indiana to Chicago—the entire line being about 586½ miles in length.

It should be here stated that the Cincinnati and Chicago Air Line Railroad Company, to which reference has been made. was formed in 1860 by the associate purchasers, at judicial sale, of the railroad from Richmond to Logansport. The decree was to foreclose a mort-

gage given by the Cincinnati, Logansport and Chicago Railway Company, and the sale was subject to the continuing lien of a prior mortgage on 27 miles of the road, between Richmond and Newcastle, given by the Newcastle and Richmond Railroad Company, then the owner of that portion, which was the same corporation as the Cincinnati, Logansport and Chicago Railway Company, with its name changed and its line of road extended from Newcastle to Logansport. After the organization of the Cincinnati and Chicago Air Line Railroad Company a bill in equity was filed in this court by James Pullan, trustee, against the last named company, to enforce said subsisting mortgage, given by the Newcastle and Richmond Railroad Company. And on July 30, 1874, a decree was rendered, adjudging that there remained due on account of said bonds and interest the sum of $933,500.44. For that sum the road from Richmond to Newcastle was directed to be sold.

On the 20th of February, 1868, the Columbus, Chicago and Indiana Central Railway Company executed to Roosevelt and Fosdick, trustees, a mortgage upon the entire railroad property of said company, with all its franchises, equipments, property. tolls, issues, profits, lands, tenements, buildings, fixtures, machinery, goods and chattels, connected with or used in the operation of said railroad, including all the property of every kind then owned or possessed, or thereafter acquired by the mortgagor, but excepting certain property which need not be here mentioned, to secure the payment of bonds then about to be issued, to the amount of $15,000,000, payable twenty years after date, with seven per cent. interest, payable semi-annually.

The mortgage recited: That the several corporations composing the mortgagor company had, prior to its consolidation, become indebted by mortgage bonds, which were still unpaid and continued a lien on the respective parts of the road and property so consolidated and united, in the amounts following, to-wit:

The Columbus and Indiana Central Railway Company, for the sum of $3,200,000 on the road from Indianapolis to Columbus, and from Richmond Junction to Union City, and for the sum of $2,000,000 on its road from Union City to Logansport, and for the sum of $800,000 on its road from Logansport to the Illinois state line, in all, the sum of $6,000,000; the Chicago and Great Eastern Railway Company, for the sum of $5,600,000, in several liens on different parts of its road, as follows: $298,000 on line between Richmond and Newcastle; $1,283,000 on line between Richmond and Logansport, and $1,820,000 on line between Logansport and Chicago, and $2,199,000 on the line between Richmond and Chicago, the last named sum being part of an issue of $5,600,000 made to take up previous liens, and $3,040,000 of said issue being unexchanged, and delivered at time of consolidation to the Columbus, Chicago and Indiana Central Railway Company.

The mortgage also recited: That it was issued in pursuance of the resolutions adopted on February 13, 1868, by the board of directors of the mortgagor corporation, by which it was declared among other things, that it was expedient to reduce to simple forms and classes all of the bonded debts aforesaid of the corporations of which the mortgagor corporation was constituted, and for which indebtedness that corporation was, by lien upon its property or otherwise. liable; that to that end an issue be made of consolidated mortgage bonds to the amount of $15,000,000, secured by mortgage upon the property, rights and franchises of the property of the consolidated company,—$11,500,000 of such issue to be used for the redemption and payment, dollar for dollar, of the like amount of the said first mortgage bonds of the several companies already mentioned.

On the 15th of December, 1868, the Columbus, Chicago and Indiana Central Railway Company, in compliance with resolutions of the board of directors, executed to Fowler and Thomas a mortgage for $5,000,000 upon its franchises, income, equipments and property, to secure the redemption or exchange of certain outstanding bonds, viz.: $821,000 of 20-year mortgage bonds of the Columbus and Indianapolis Central Railway Company; $1,243,000 income bonds of the Columbus and Indiana Central Railway Company; $400,000 of the Chicago and Great Eastern Railway Company construction and equipment bonds, and other indebtedness, estimated at $2,500,000.

On the 22d of January, 1869, the Columbus, Chicago and Indiana Central Railway Company leased to the Pittsburg, Cincinnati and St. Louis Railway Company upon certain terms its entire lines of railroad, 586½ miles in length, with all its franchises and property of every kind and description, except such property as the lessor company then owned or might thereafter acquire which need not be used for any purposes incident to the management or operation or repair of the railroad, or in the business of said railway company.

The lease was for the term of ninety-nine years, renewable at the election of the lessee, for like periods forever, on the same terms, stipulations, and conditions, subject, however, to its earlier determination as in the lease provided. The lease provided that the lessee would, at its own cost, risk, and expense, during the term, keep, preserve and maintain the demised railroad in good working condition and repair as a first-class railroad, and operate the same to the end that as large an amount of earnings and profits may be made and realized therefrom as can lawfully and reasonably be made and realized under the terms of the lease; that during the term of the lease, the lessee should have the exclusive right to manage and control the demised railroad and premises. and to regulate, determine, and collect tolls, freight,

and charges, and enjoy all the corporate powers, rights and privileges appertaining to said demised premises, as fully as the lessor company could do.

In consideration of the rights secured by the lease it was agreed that the lessee should pay out of the annual gross earnings all taxes and assessments of every kind, imposed or assessed against the lessor of the leased property, including the business done upon the line, in the same manner and to the same extent that the lessor would have to pay, if operating its own line; that of the surplus of the annual gross earnings the lessee should be entitled to receive 70 per cent. for its own sole and exclusive use; that the remaining 30 per cent. of gross annual earnings should be applied and paid by the lessee as follows:

First—To the payment of the interest that may accrue after February 1, 1869, being at the rate of seven per cent., on all the mortgage bonds of the party of the first part. to the extent of $20,000,000, in accordance with their respective equities and priorities.

Second—To the payment of the interest upon the income bonds of the party of the first part, which may hereafter be issued to the party of the second part for the purposes of construction hereinafter mentioned, said interest to be deposited in ample time to meet the accruing coupons, at some bank, trust company, or agency, in the city of New York, as may be agreed upon from time to time by the parties of the first and second parts: Provided, nevertheless, that if the said 30 per cent. should not in any one year be equal to the sum required for the payment of the interest as aforesaid, then, and in that event, the party of the second part shall and will, at their own cost and expense, and without charge to the party of the first part, pay to said agency or agencies the amount required to pay said interest, as the same shall become due and payable.

Third—To the payment of whatever surplus may remain in any one year of the said balance of 30 per cent. to the treasurer of the party of the first part, annually on the 1st day of March; or if, in the opinion of the said party of the second part, the probable annual surplus shall justify the same, that semi-annually, on the first days of September and March, in each year, for dividends upon the stock, and for such other purposes as the party of the first part may determine.

In order to provide for the payment or redemption of the $20,000,000 of 7 per cent. mortgage bonds of the lessor, the lessee agreed to establish an annual sinking fund, as required of the lessor by the terms of the mortgages, and upon the redemption and cancellation of such bonds, the lessor agreed that it would, in consideration thereof, pay or issue to the lessee, at its option, 7 per cent. bonds at par for an equal amount, to be secured by a mortgage having a first lien,

unless otherwise agreed upon, or issue to the lessee shares of the capital stock of the lessor.

It was further stipulated in the lease: That the lessee should provide means for and acquire any needful right of way and real estate, erect such necessary depot buildings, shops, engine-houses, side tracks, and appurtenances, and for other permanent construction as may be reasonably required to accommodate the traffic of the demised railroad, and for actual advances so made the lessee should be entitled to receive 7 per cent. income bonds, convertible into stock, at the option of the holder, at any time—all such expenditures not to exceed $2,000,000 for the (then) next three years;

That no issue of bonds beyond the $15,000,000 of first mortgage consolidated bonds, and the $5,000,000 second mortgage consolidated bonds, and the $2,000,000 of income bonds should be made by the lessor without the consent of the boards of directors of the parties to the lease; the one-half of the $5,000,000 second mortgage bonds to be used in taking up certain income and other bonds then outstanding, not included in the $15,000,000 loan aforesaid, on the different lines composing the leased lines; the other half to be used in paying off the debts due and to become due, of all kinds of the lessor, except the said borrowed debt of $22,000,000;

That no further issue of bonds should be made, except as provided, or stock issued beyond the sum of $13,000,000, except as the same may be increased by the conversion of bonds into capital stock of the company, in which case the bonds so converted shall be canceled, making, in the aggregate, of bonds and stock, $35,000,000;

That the lessee should pay for all supplies and equipments delivered on prior contracts, after it obtained possession of the railway, and the lessor pay for all supplies and equipments delivered before the lessee takes possession, including all pay-rolls and other floating indebtedness, so that the railroad and other property shall be made free of all debt, except first mortgage bonds to the amount of $15,000,000, second mortgage bonds to the amount of $5,000,000, and $2,000,000 of income bonds to be issued, as provided in the lease, for construction purposes;

That in case of default of interest on the bonds or sinking fund for sixty days after the same shall become due and payable, or default in carrying out any of the provisions of the lease by the lessee or the guarantor to be done or performed by them respectively, for the space of four months, the lessor might take possession of all the property leased and other permanent property added thereto, without prejudice to any right of damages which the lessor may have by reason of said default;

That upon the failure of the lessee to perform the covenants of the lease, the guarantor should perform the same on behalf of

the lessee, reserving all the profits and advantages therefrom to which the lessee would be entitled; and

That the leased lines shall, at all times, be placed upon a perfect equality with any other line or lines of railway that may connect at Pittsburg, as to the rate and facilities for joint transportation for all classes of traffic to and from all points east and west—the expressed intention of the parties being to place the leased lines, in respect to the Pennsylvania railroad and its eastern connections, upon terms equally favorable to those granted to any other line.

To the foregoing lease the Pennsylvania Railroad Company was a party. In consideration of the covenants and agreements recited, and of the benefits and advantages accruing and to accrue to it therefrom, that company guaranteed to the lessor corporation that the lessee corporation would keep and perform all the covenants and agreements of the lease, and, in default thereof, the Pennsylvania Railroad Company, upon notice to it in writing of the kind and reason of such default, would keep and perform such covenants and agreements for and on behalf of the lessee corporation—in which event, the lessor and lessee corporations agreed that the said company, at its option, should be entitled to all the profits and advantages which might or could arise or accrue therefrom to the lessee corporation.

After the execution of this lease, the Pittsburg, Cincinnati and St. Louis Railway Company took possession of the leased property. But very shortly after possession was taken, it expressed dissatisfaction with the lease, and sought a modification of its terms. There is some conflict in the evidence as to the grounds upon which the claim to such modification was based. It is, perhaps, not material to inquire now whether any just reasons existed for dissatisfaction, or whether the lessor corporation could have been required to accede to any alteration or change in the terms of the lease. It is sufficient to say that the parties to the original lease, on December 10, 1870, executed an additional agreement, dating it back to February 1, 1870.

That agreement is, perhaps, the most important document in this case, and is, therefore, given at length:

"Agreement made this first day of February, 1870, by and between the Columbus, Chicago and Indiana Central Railway Company, of the first part, the Pittsburg, Cincinnati and St. Louis Railway Company, of the second part, and the Pennsylvania Railroad Company, of the third part. Witnesseth: That for and in consideration of the covenants hereinafter contained, and of the benefits expected to result therefrom, the parties have agreed with each other:

"Art. I. The party of the first part agrees and undertakes to arrange, provide for and so adjust and classify all their indebtedness now existing, that $15,821,000 thereof shall be represented by bonds bearing seven per cent. interest, secured by mortgage upon the estate and property of the said party of the first part, the $821,000 being Columbus and Indianapolis Central Railway Company second mortgage bonds; and that all other indebtedness of said party, and all payments and advances heretofore made on or for interest, construction, operating and maintaining said road, accounts and expenditures made by the second and third parties, or either, in excess of the receipts heretofore derived from the business and transportation on and over said road, shall be represented by bonds bearing seven per cent. interest, entitling the holder to vote, secured by a mortgage upon all the estate and property of said company, which bonds shall be payable after twenty years, at the pleasure of said first party, and shall be convertible into preferred capital stock, bearing seven per cent. interest, at par, at any time within fifteen years, at the option of the holders of the same, which issue of bonds shall not exceed $10,000,000, to be received by the said second and third parties at par, in payment of their claims and advances, so far as they are entitled and may hereafter become entitled to same.

"Art. II. That hereafter the party of the second part covenants and agrees to pay and apply the thirty per cent., being the balance of the gross earnings of the railroad of the party of the first part, as follows: First—For the payment of the coupons, as they shall from time to time mature, upon the said bonds, representing and amounting to the aforesaid sum of $15,821,000. But if the same shall not be adequate to such payment in full in any one year, then the said party of the second part will pay any such deficiency out of its own proper moneys, without charge, reclamation, or subrogation therefor. Second—Out of any surplus of said thirty per cent. remaining after payment of said interest, to pay the same pro rata, as interest or dividends, to and among the holders of the convertible bonds provided for in the first article of this agreement, based on the entire amount of the income bonds convertible into preferred stock, as provided for in the first article of this agreement, actually issued, and the bonds which the holders have the option to convert into the said income bonds, and the holders of any stock into which any of said bonds may have been converted by the holder, in the exercise of the option so to do, provided for in the bonds, and also of any bonds hereafter to be issued under the provisions of a subsequent article of this agreement, to represent new constructions and additional equipment for the use of the railroad of the party of the first part; and Third—To pay to a sinking fund to be established for the redemption of said mortgage bonds, the one-half of one per cent., provided for in the mortgage to secure the payment of said $15,821,000 of bonds, for the use and

benefit of the first party; and after such payment, any surplus of said thirty per cent. remaining to be divided pro rata as a dividend upon the common stock of the said party of the first part.

"Art. III. All sums expended by the party of the second part after the date of the agreement of January 22, 1869, and the interest thereon at seven per cent., upon the cost of any new equipment provided by the party of the second part, necessary for the successful operation of the road of the party of the first part, shall be promptly liquidated and paid to the second party in said convertible bonds at par.

"Art. IV. Any defects of power or authority (if such there be) to enter into and effectuate the agreement of January 22, 1869, and of this present agreement existing between the parties hereto shall be removed, and the requisite authority therefor be obtained at the earliest practicable time; and thereupon either party may require of the other the due execution of such instruments as will perfect, confirm and render operative and binding said agreement.

"Art. V. Whenever this agreement shall conflict with the provisions of the agreement of January 22, 1869, by and between the parties hereto, the said agreement of January 22, 1869, shall, in those particulars and to that extent, be deemed and taken to be changed and modified, and the party of the third part unites in the execution of this agreement in testimony of its assent to such modification.

"It is understood that annual gross earnings, mentioned in the sixth article of the original lease, shall be held to mean the annual gross revenues of the road of the party of the first part, after the deduction therefrom of all pro rata bridge tolls, drawbacks allowed on freight traffic, terminal expenses allowed to other railroad corporations on through business between the East and West, and whatever amount is paid to the Chicago and Northwestern Railroad Company per passenger and per hundred on freight for the use of their road, until the road of the party of the first part is completed to its proper terminus in Chicago.

"It is understood and agreed between the parties hereto that the thirteenth article of the original lease shall be amended and modified so as to read as follows, viz.: 'Passenger trains shall be so run as to develop and increase the local and through business upon said road of the party of the first part, and where connections are made between Chicago and the East, via Pittsburg, the speed thereof shall be pro rated upon the needs of all parties hereto, and the party of the third part shall not run trains at higher rates of speed for any other connecting line, nor grant facilities of any kind that shall not be equalled by those given to the parties of the first and second parts; and in case the organization of the party of the second part, for the procurement of either passengers or freight in the Eastern cities or in the West shall not be satisfactory to the party of the first part, then the said party of the first part may use its own organization, at its own expense, for the procurement of above traffic in the East or West, being governed in the securing of such traffic by the rates fixed or agreed to by the party of the second part; and no consolidation of earnings or running arrangements shall be made by the party of the second part with any other company, for competing business or traffic, without the consent of the party of the first part.' "

On the 28th of April, 1870, the board of directors of the Columbus, Chicago and Indiana Central Railway Company, by resolution, directed the issue of bonds to an amount not exceeding $10,000,000, convertible at any time within fifteen years from date into preferred capital stock at par, bearing a dividend of seven per cent. interest, out of an interest fund to be provided, and prior to the payment of any dividend on the common stock of the company. The interest fund, and the amount thereof which could be applied to the payment of the seven per cent. interest on the said convertible bonds, and the seven per cent. on the preferred stock created by the conversion of said bonds into such stock, was to be ascertained annually, as follows: From the gross and entire revenue and income of the railroad and its appurtenances owned by the company, there shall each year, commencing February 1, 1870, be deducted payments on certain designated accounts. Thirty per cent. of the remaining balance was to be applied as follows: First, To pay the interest on $15,000,000 of bonds being the interest on bonds of the Columbus, Chicago and Indiana Central Railway Company, and on the bonds which they are to represent and be exchanged for, as provided in the mortgage deed of said company, dated February 20, 1868. To pay, also, the interest on $821,000 of outstanding second mortgage bonds of the Columbus and Indianapolis Central Railway Company, dated November 1, 1864. Second, To pay the salaries and other expenses incident to the corporate organization, not exceeding, however, $20,000. Third, To pay out of said thirty per cent. so much thereof as may be net earnings, and required by the provisions of said mortgages to be so applied to the sinking fund. Fourth, The balance and residue of said thirty per cent. to be deemed and taken to be the interest fund for the payment of the interest on the then outstanding convertible bonds and on the preferred stock created by the conversion of said bonds into preferred stock.

The resolutions of the board further provided: That so much of said interest fund as, in the opinion of the company, might be necessary for that purpose may, from time to time, be used in adjusting the (then) present

outstanding bonds of the company, and the companies merged in that company by consolidation, so as to make the bonded debt of the company conform to the agreement by which said bonded debt is to be reduced to $15,821,000.

That said convertible bonds should be negotiated under the direction of the board of directors, to take up, retire, and cancel so much of all the bond indebtedness then existing, whether made by it or by any company merged in that company by consolidation, "as that the said bond indebtedness shall be reduced to $15,821,000, leaving outstanding the present existing bonded debt the $15.000,000 first mortgage bonds of this company, and $821,000 of the second mortgage bonds of the Columbus and Indianapolis Central Company;" also, to fund and pay all other existing indebtedness of the company, and also to issue so many of said convertible bonds as may be further required by, and in performance of. the terms of an agreement between the company, and the Pittsburg, Cincinnati and St. Louis Railway Company, and the Pennsylvania Railroad Company, dated February 1, 1870.

In accordance with those resolutions a mortgage was executed upon the property of the railroad, containing the foregoing stipulations, to Parkhurst and Thompson, trustees, to secure the payment of $10,000,000 of convertible bonds.

About the date of the actual execution of the amended lease, (December, 1870,) the following letter, signed by the presidents respectively of the Pennsylvania Railroad Company and the Pittsburg, Cincinnati and St. Louis Railway Company, was prepared and delivered to the persons to whom it was addressed:

"To Messrs. W. R. Fosdick and James A. Roosevelt, trustees, and A. Parkhurst. trustee: Gentleman: Under the contract and lease of the Columbus, Chicago and Indiana Central Railway, dated January 22, 1869, as amended by the contract of February 1, 1870, the Pittsburg, Cincinnati and St. Louis Railway Company, as lessee, which lease the Pennsylvania Railroad Company has guaranteed, will, by the terms of said lease, pay the interest as it matures on the $15,000,000 of the first mortgage consolidated bonds of the Columbus, Chicago and Indiana Central Railway Company, or on the bonds which they represent, and on $821,000 of the second mortgage bonds of the Columbus and Indianapolis Central Railway Company, which bonds are secured by deed of trust, made respectively to you. You are, therefore, authorized to inform the holders of said bonds, and to give such further public notice as you may think proper, that the interest on the said $15,821,000 of bonds will be regularly paid by the Pittsburg, Cincinnati and St. Louis Railway Company or the Pennsylvania Railroad Company, according to the tenor of said amended contract and lease."

On 27th of October, 1874, a written notice was given by the Pittsburg, Cincinnati and St. Louis Railway Company to the Columbus, Chicago and Indiana Central Railway Company, which, after reciting the execution of the original and amended lease and the mortgages aforesaid, proceeded:

"And whereas, four years and nine months have elapsed since the date of said supplemental agreement, yet the Columbus, Chicago and Indiana Central Railway Company has not complied with the covenants in said agreement, and by reason thereof suits have been instituted against them by holders of certain of their obligations prior in date to the date of the original agreement, namely, the 22d day of January, 1869; and a decree having been rendered by the circuit court of the United States for the district of Indiana for the sale of a part of the demised premises, twenty-seven miles of road, lying between Richmond and Newcastle, for an unpaid debt of $932,500.44, whereby the Pittsburg, Cincinnati and St. Louis Railway Company, as lessees, are in imminent risk of being ousted from the possession of said property and having legal proceedings instituted against them for an accounting of rents, issues, and profits derived by their operation and management of the line of railway of the Columbus, Chicago and Indiana Central Railway Company, or portions thereof.

• "And whereas, the duties of the Pittsburg, Cincinnati and St. Louis Railway Company, while they remain in possession of said property derived from the Columbus, Chicago and Indiana Central Railway Company, as well as their obligations to the public as common carriers over the line of said road, to provide safe roadway and equipment, and proper facilities for the transaction of public business, have heretofore required, and will continue to require, large expenditures of money by the Pittsburg, Cincinnati and St. Louis Railway Company, all of which said money, already amounting to more than three million of dollars is jeopardized and endangered by reason of the default of the Columbus, Chicago and Indiana Central Railway Company in not complying with the terms of their said agreement.

"Now, therefore, you are hereby notified that unless your company, namely, the Columbus, Chicago and Indiana Central Railway Company, shall, on or before the 1st day of January, 1875, carry out and fulfill in good faith your said covenant and agreement, as set forth in said amended lease, dated 1st day of February, 1870, this company, namely, the Pittsburg, Cincinnati and St. Louis Railway Company, will institute proceedings to compel the specific performance of the agreement dated the 22d day of January, 1869, and the agreement supplemental thereto, dated the 1st day of February, 1870, and, in the alternative, such relief as they may be entitled to in equity."

On the 28th of January, 1875, the Pitts-

burg, Cincinnati and St. Louis Railway Company gave the Columbus, Chicago and Indiana Central Railway Company another notice, which, after reciting the notice of October 27, 1874, declares:

"The 1st of January, 1875, having expired without your company having carried out and fulfilled your covenant and agreement, as referred to in said notice, the Pittsburg, Cincinnati and St. Louis R. W. Co. hereby notify you that they have, through their counsel, commenced the preparation of a bill in equity to compel the specific performance of the existing leases, and, in the alternative, such relief as they may be entitled to in equity, which bill it is their intention to file in a court of competent jurisdiction without delay; and that, under these circumstances, the Pittsburg, Cincinnati and St. Louis Railway Company are advised that it is their duty to decline and refuse to make any payments under said lease or amended lease, or otherwise, except under and according to such orders or decrees as a court of competent jurisdiction may finally make in these premises, defining the legal and equitable rights and liabilities of the parties. But pending the submission of said bill to said court for its decree and orders we will make an advance to your company, if desired by you, but under protest, of $24,836, to meet certain of your coupons maturing Feb. 1, prox., as per your notice. This advance will only be made under protest, and with the distinct understanding and notice that it shall not affect, in any manner, the said notice of October 27, 1874, which we gave you, or our rights in any form as lessees of your property. Our company will hold itself ready at all times to account to any court of competent jurisdiction that may have the case in charge, for all net earnings that may have been received from your property since 1st of January, 1875."

On 2d of February, 1875, Roosevelt and Fosdick filed their bill in the circuit court for the Northern district of Illinois, the district of Indiana, and the Southern district of Ohio, against the Columbus, Chicago and Indiana Central Railway Company. The object of the bill was to foreclose the first consolidated mortgage. It alleged the failure of the defendant to comply with its agreement, contained in the mortgage, to create a sinking fund for the redemption of the bonds issued under the mortgage; that the company had failed to pay the interest due upon bonds secured by prior mortgages upon certain portions of the road, or the interest on the second consolidated mortgage bonds due August 1, 1874; that in view of its large floating debt, and its insolvency, its net earnings were liable to be diverted and misapplied, unless a receiver of its earnings and income was appointed, and such earnings and income properly applied through him. The bill sets out the original and amended lease and says: "The said lease is one beneficial

to the lessors and their creditors, or parties claiming under them, and that the interest of the mortgage bondholders secured by the mortgage * * * does not require that for the present, at all events, the possession of the said lessees should be disturbed, provided they comply with the terms and conditions of such lease and contract; but that the rights and interests of your orators, and of the bondholders secured by the said mortgage to them, will be for the present sufficiently secured and protected by the appointment of a receiver of the said mortgaged premises, and the incomes and earnings thereof, with the directions to the said receiver, until further ordered by the court, not to disturb the possession of the said lessees under their lease, but to collect and receive the rental payable by said lessees or their guarantors, under and pursuant to the provisions of said lease, and apply the same in such a manner as shall be provided by the order of this court, and as shall be agreeable to equity."

The appearance of the company was entered on the same day the bill was filed and an order immediately made appointing Roosevelt and Fosdick receivers of the railroad and other property covered by the mortgage to the complainants, and of the earnings and income, rents and profits thereof, with directions not to disturb the lessee corporation in the possession of the property, but to collect and receive the rental stipulated in the lease and amended lease, and apply the same in such manner as shall be provided by the further order of the court. The defendant company was further ordered to transfer and convey to said receivers the railroad and other mortgaged premises, and the income, rents, issues, and profits thereof.

In the suit just referred to, Roosevelt and Fosdick filed a supplemental bill alleging additional defaults in the payment of interest due on the first consolidated mortgage bonds, which said trustees were without funds to pay, all the funds received by them having been inadequate to pay the interest due upon the outstanding sectional mortgage bonds prior in lien to the first consolidated mortgage. It was further alleged in the supplemental bill that any sale of the mortgaged property under a decree of foreclosure, should be made without abrogating the lease and guaranty, but subject to the lease and guaranty in such manner that the purchaser should succeed to and be vested with the right to receive and collect the stipulated rent.

By an order entered June 1, 1875, Roosevelt and Fosdick, as trustees or receivers, were authorized, by judicial proceedings in any court of competent jurisdiction, to enforce the provisions of the lease and amended lease against the Pittsburg, Cincinnati and St. Louis Railway Company, and the Pennsylvania Railroad Company, or either of them. Such a suit was instituted in the supreme

court of New York against the Pennsylvania Railroad Company, and removed to the circuit court of the United States.

On the 25th of February, 1875, the Pittsburg, Cincinnati and St. Louis Railway Company commenced suit in this court against the Columbus, Chicago and Indiana Central Railway Company and Roosevelt and Fosdick, making the Pennsylvania Railroad Company and Pullan also defendants. The bill set out at length the history of the lease and the amended lease, and also the notices already referred to.

The relief sought is shown in the prayer that the court "will order, adjudge, and decree that said defendant, the Columbus, Chicago and Indiana Central Railway Company, is in default for failing to perform its said agreement to classify and fund said indebtedness, and, by reason thereof, that said lease and the relation of lessor and lessee thereby intended to be created and continued between said parties has been ended, and that said lease and amended lease be rescinded, set aside, and delivered up to be canceled, and that the plaintiff recover of the said defendant such sums of money as shall, in an account duly taken, appear to be justly due by reason of their mutual dealings under said lease, and that the said defendant resume possession of said railroad and all other demised property, free and discharged of said lease, unless the defendant shall, within some reasonable time to be fixed by the court, specifically perform its said covenant aforesaid, and arrange, adjust, classify, and fund its said indebtedness, as by the terms of said agreement of February 1, 1870, it is bound to do. And in the meantime, pending this suit, the complainant prays, inasmuch as from the nature and situation of said described property and its public character as a highway for trade and travel, it would be improper for the complainant, notwithstanding its strict legal right so to do, to abandon immediately its possession and refuse to continue its occupation of said railroad and other property, your honorable court to appoint a receiver to take possession of the same and operate it, under the orders of the court, until final decree, the complainant hereby offering, until such appointment, to hold and operate the same, accounting to the court for the receipts arising from the same, paying the net profits thereof from time to time into the registry of the court as it may order, for the benefit of any and all parties showing themselves entitled thereto; and for such other and further relief as to the court may seem equitable and just."

After the institution of this action, an order was entered requiring the Pittsburg, Cincinnati and St. Louis Railway Company to pay into court, from time to time, the net earnings of the road, to be applied, by direction of the court, to payment of interest upon bonds secured by mortgages upon parts of the consolidated road, prior to the consolidated mortgage, but without prejudice to the claims of any of the parties. Thereupon the order under the authority of which Roosevelt and Fosdick brought the suit in New York was suspended, and all proceedings thereunder stayed.

Roosevelt and Fosdick then filed their cross-bill in this cause against the Pittsburg, Cincinnati and St. Louis Railway Company, the Pennsylvania Railroad Company, the Columbus, Chicago and Indiana Central Railway Company to enforce the lease and amended lease, and to recover the rental due thereunder. To this cross-bill the two companies first-named filed an answer. To the original bill answers were filed by the Columbus, Chicago and Indiana Central Railway Company, Roosevelt and Pullan. The latter also filed a cross-bill, seeking the enforcement of his decree against the Columbus, Chicago and Indiana Central Railway Company, and to compel the Pittsburg, Cincinnati and St. Louis Railway Company to pay to him the proportion of the earnings due to him. To the cross-bill of Pullan the Columbus, Chicago and Indiana Central Railway Company demurred.

The foregoing statement does not, perhaps, recite all the facts to which counsel in their oral and printed arguments have adverted, but it is sufficient to present all the substantial issues made by the pleadings.

It will not be expected, I am sure, that I shall review the numerous authorities cited, or discuss with any elaboration the difficult and important propositions of law which arise in the case. The onerous character of my duties during the present term of the supreme court have rendered it impossible for me to pursue that course. While I have examined, with care, the adjudged cases and the elementary works to which counsel have referred, and while, under some circumstances, I should be glad to prepare an extended opinion, I can do nothing more, at this time, than indicate briefly and in very general terms the conclusions which I have reached upon the vital points in dispute.

The right to the relief asked in the bill is placed by complainant upon numerous grounds.

First—It is claimed by the Pittsburg, Cincinnati and St. Louis Railway Company that the lease in question was void ab initio. In support of this general proposition it is argued: That the Columbus, Chicago and Indiana Central Railway Company, under the laws of Indiana, had no authority to make such a lease of its railroad in Indiana; that if such authority existed, it has not been pursued, there having been no corporate power exerted, in Indiana, nor according to its laws; that under the laws of Ohio the Pittsburg, Cincinnati and St. Louis Railway Company was not authorized to take a lease of a railroad in Indiana; and, that the parties are not estopped from asserting the invalidity of the lease.

Upon examining the laws of Indiana in force when the lease and amended lease were executed, I find—

1. There is no statute of Indiana which in terms forbids or prohibits railroad corporations of that state from executing leases of their property.

2. By an act, approved February 23, 1853, it is provided that any railroad company theretofore organized under the general or special laws of that state, shall have the power "to intersect, join, and unite their railroad with any other railroad constructed, or in progress of construction, in this (that) state, or in any adjoining state, at such point on the state line, or at any other point, as may be mutually agreed upon by said companies, and such railroad companies are authorized to merge and consolidate the stock of the respective companies, making one joint-stock company of the two railroads thus connected, upon such terms as may be by them mutually agreed upon, in accordance with the laws of the adjoining state with whose road or roads connections are thus formed: Provided their charters authorize said railroads to go to the state line, or to such point of intersection." 1 Gavin & H. Ind. St. 526.

3. By the same act an Indiana railroad corporation, organized for the purpose of constructing a railroad from any point within that state to the boundary line thereof, is empowered to extend its road into or through any other state or states under such regulations as may be prescribed by the laws of such state or states into or through which said road may be extended.

4. By the same act any Indiana railroad corporation which may have constructed, or commenced the construction of its road so as to meet and connect with any other road in an adjoining state at the boundary line of that state, is empowered "to make such contracts and agreements with any such road constructed in an adjoining state, for transportation of freight and passengers, or for the use of its said road, as to the board of directors may seem proper."

5. By the act approved March 4, 1863, providing compensation to the owners of animals killed or injured by the cars, locomotives, or other carriages of the railroad companies in that state, the same remedy is given against lessees as against others. 3 Ind. St. [Davis' Supp.] 413. See, also, 35 Ind. 291.

6. By an act passed December 18, 1865, to secure a just valuation and taxation of all railroad property of "railroad companies having the whole or any portion of their lines within this (that) state," it is provided that "in case any railroad or part thereof shall have been, or shall hereafter be leased, conveyed, or mortgaged to any other railroad company, and shall be in the possession of such other company under such lease, conveyance, or mortgage, the road or part thereof so leased, conveyed or mortgaged, shall, during the continuance of such possession, be assessed for taxation as the property of the company having such possession, in the same manner as if it were a part of the road of such lessee, grantee, or mortgagee under its own charter; and such lessee, grantee, or mortgagee shall, during the continuance of such possession, have all the rights and be subject to all the duties and liabilities in relation to the road, or parts thereof so held, which are created by this act, and both its property and the road or parts thereof so held, shall be liable for the payment of such taxes in the same manner as railroad property is, in other cases, made liable for taxes properly assessed against the same." 3 Ind. St. [Davis' Supp.] 418–421.

7. By an act passed April 29, 1869, for the organization of companies to construct lateral roads, it is provided that in cases of sale or assignment "the purchasers, assignees, or lessees thereof shall file the same in such recorder's office." 3 Ind. St. [Davis' Supp.] 406.

8. The question of power to lease seems not to have been conclusively determined by any decision in the supreme court of Indiana. In the case of Board of Com'rs of Tippecanoe Co. v. Lafayette, M. & B. R. Co., 50 Ind. 85, it appears that a stockholder, in a direct suit for that purpose, assailed the right of an Indiana railroad corporation to transfer, or provide for the sale of, to an Illinois railroad corporation, a part or division of its road. The authority for such transfer was based upon the act of February 23, 1853, already cited. The court said: (page 110) "Even if this section could be held to authorize the transfer of the use of one road to another, the words cannot fairly mean the transfer of one division of a road to the injury of another division of the same road, thus putting the two divisions in direct antagonism, both in their interests and connection." But further along in the opinion the court says: (page 115) "We do not decide that railroad companies cannot become lessors or lessees of other railroad companies, or make other contracts with other railroad companies for the purpose of running their lines in conjunction, facilitating commerce, travel, and transportation, or for any of the legitimate purposes for which railroad companies are organized. There is much in the legislation of the state favoring this view, and many decisions of this court sustaining the advancing enterprise of the country, but all such contracts must come within the powers of the corporation, must not exceed the powers of the agency that makes them, must not violate the rights of stockholders, or contravene public policy." That the precise question here presented was not intended to be decided by the supreme court of Indiana is entirely clear from the following language in the opinion delivered in that case in response to a petition for a re-hearing:

(page 119) "The appellees seem to think that we ought to have decided the general question, whether railroad companies can lease their roads under the laws of this state. * * * When such a question is properly raised before us upon a lease made for the legitimate purposes of commerce and travel, and in accordance with the proper use of railroads, it will be our duty to decide whether such a lease is authorized and can be upheld by the laws of this state." It is evident that the decision in 50 Indiana is an authority only for the proposition that an Indiana railroad corporation cannot legally transfer to another corporation one division of its road, so as to bring it in direct antagonism with the other divisions of the same road. Nothing more was decided. We are, therefore, uninformed by any decision of the supreme court of Indiana upon the precise question under consideration.

My own conclusion is that the lease made by the Columbus, Chicago and Indiana Central Railway Company to the Pittsburg, Cincinnati and St. Louis Railway Company was neither in violation of the statutes, nor against the public policy of Indiana. The road of the lessor company met and connected at the boundary line of the state with another railroad which was constructed under the authority of an adjoining state. That company was given, by express words, the broad power of contracting for the use of its said road, with any company whose road was thus constructed in an adjoining state. The lessor and lessee companies are connecting roads, within any fair meaning of the act of February 23, 1853. We have seen that, by the same statute, the Columbus, Chicago and Indiana Central Railway Company was authorized to unite its road with the road of an adjoining state on the state line, or at any other point agreed upon, and the two companies whose roads were thus united, could merge and consolidate their stocks and make one joint-stock company, in accordance with the laws of the adjoining state. Under the same statute, it could have extended its line into and through an adjoining state, under such regulations as that state might prescribe. In its capacity as lessee of the Columbus, Chicago and Indiana Central Railway Company, the Pittsburg, Cincinnati and St. Louis Railway Company is unquestionably liable, in the state of Indiana, to the taxation which is imposed in that state upon railroad property in the possession of lessees. As such lessee corporation it may be held liable in that state and by virtue of its statutes, for damages arising from the killing or injury of stock through the negligence of its employés.

In view of the powers thus conferred, and the liabilities thus imposed, by statute, upon railroad corporations created under the laws of Indiana, and in the absence of any direct adjudication upon the subject by the highest court of that state, I am unwilling to hold that the lease in question is in contravention either of its statutes or its public policy. I should be very slow to reach such a conclusion since the parties stipulated that any defects of power or authority (if such there be) to enter into and effectuate the agreement of January 22, 1869, or that of February 1, 1870, should be removed, and the requisite authority therefor be obtained at the earliest practicable time. Had the conclusion been reached that there was a want of statutory authority or power in the lessor corporation to make the lease in question, I should have felt obliged, both by the letter and spirit of the agreement between the parties, before decreeing rescission upon that ground, to give reasonable time for an application for relief to the legislative department of Indiana.

Second—I cannot yield my assent to the next proposition of the lessee company, that it was essential to the validity of the lease that its original execution or subsequent ratification should have been evidenced by corporate action taken by the lessor corporation within the limits of the state of Indiana. The general rule undoubtedly is, that corporate action taken, or corporate acts performed, by the body of the corporation, beyond the bounds of the sovereignty granting the charter, may, generally, be treated as null and void. But that rule, in the very nature of the case, cannot apply to the case of a consolidated company, whose road extends through three states, and where there is no express statutory prohibition against the corporate body taking corporate action in any one of the states through which the road of the consolidated company extends. The state of Indiana could, by statute, require corporations, whether originally created or consolidated under its laws, to take no corporate action beyond its limits. But it is sufficient to say that the state has passed no such statute.

Third—The objection that the Pittsburg, Cincinnati & St. Louis Railway Company were not authorized by the laws of Ohio to take the lease in controversy, depends upon the construction to be given to the 24th section of a statute of that state approved May 1, 1852, entitled "An act to provide for the creation and regulation of incorporated companies in the state of Ohio," 50 Laws Ohio, 1852, p. 281, as amended by an act passed March 19, 1869. 66 Laws Ohio, 1869, p. 32. The effect of the amendment can be best understood by putting that section as it appeared in the original act in juxtaposition with the amendment of 1869:

| Act of 1852. | Amendment of 1869. |
|---|---|
| "Any railroad company heretofore or hereafter incorporated may at any time, by means of subscription to the capital of any other company or otherwise, aid such company in the construction of its railroad for the purpose of forming a connection of said last-mentioned road with the road owned by the com- | "Any railroad company heretofore or hereafter incorporated may at any time, by means of subscription to the capital of any other company or otherwise, aid such company in the construction of its railroad, *within or without the state*, for the purpose of forming a connection of said last-mentioned road |

pany furnishing such aid; or any railroad company, organized in pursuance of law, may lease or purchase any part or all of any railroad constructed by any other company, if said companies' lines of said road are continuous or connected as aforesaid, upon such terms and conditions as may be agreed on between said companies respectively; or any two or more railroad companies, whose lines are so connected, may enter into any arrangement for their common benefit, consistent with and calculated to promote the objects for which they were created," etc.

with the road owned by the company furnishing said aid; or any railroad company organized in pursuance of law, may *lease* or purchase any part or all of any railroad, *the whole or part of which is in this state, and* constructed, *owned or leased* by any other company, if said companies' lines of said road are continuous, or connected *at a point either within or without this state,* upon such terms and conditions as may be agreed on between said companies respectively; or any two or more railroad companies, whose lines are so connected, may enter into any arrangement for their common benefit, consistent with and calculated to promote the objects for which they were created," etc.

I perceive no difficulty in ascertaining the intention of the act of 1869. According to its express provisions a railroad company organized under the laws of Ohio may lease or purchase any railroad which is in whole or in part in that state, and owned or leased by any other company, if said companies' lines of road are continuous or connected at a point either within or without Ohio. The power thus given to Ohio railroad corporations was exerted in this case by the Pittsburg, Cincinnati & St. Louis Railway Company when it took the lease in question. I cannot assent to the proposition that the power to lease thus conferred was intended to apply only to railroads, or such parts thereof, as are situate in Ohio. The act, among other things, was plainly intended to give Ohio railroad corporations power to take leases of railway lines within or without Ohio where the road of the lessee was connected at a point either within or without the state with the lines of the lessor company, thus establishing direct connections between railroads constructed in Ohio, under the authority of its laws, with lines of road constructed in other states. The manifest object of the statute was to attract business from other states over the lines of the Ohio railroads.

My conclusion, therefore, is that the lessee corporation was not forbidden by the laws of Ohio to take the lease in question.

Fourth—The next proposition to be considered is whether, if originally valid, the lease has been terminated by the eviction of the lessee by paramount title. In support of this proposition the complainant refers: 1st, to the decree of July 30, 1874, in the Pullan Case, whereby the road, in Indiana, from Richmond to Newcastle, twenty-seven miles in length, and part of the lines leased to the Pittsburg, Cincinnati & St. Louis Railway Company was ordered to be sold to satisfy the claim of the Pullan trustee. 2d. To the proceedings in the suit instituted by Roosevelt and Fosdick, trustees in the first consolidated mortgage, under which they were appointed receivers, with power to receive

rents and profits due from the lessee corporation.

I am of opinion that neither the Pullan decree nor the proceedings in the suit of Roosevelt and Fosdick against the Columbus, Chicago and Indiana Central Railway Company furnish just grounds for the absolute rescission at this time of the contracts of leasing.

The eviction complained of is not an actual but a constructive eviction. Pullan, it is said, has the power at any moment to turn complainant out of a portion of the demised premises, and the existence of this power is permitted by the lessor corporation. But that in every essential sense was the case when the lease was executed. The mortgage under which Pullan claimed was then a mere incumbrance. And that is all that may be said of the unexecuted decree entered in a suit to which neither the Pittsburg, Cincinnati and St. Louis Railway Company nor the Columbus, Chicago and Indiana Central Railway Company were parties. He may never execute that decree, and so long as he does not disturb the possession of the lessee corporation or imperil its permanent control of the demised property, according to the terms of the lease, his decree should not, according to the weight of authority, especially in Indiana, be regarded an eviction by paramount title, entitling the lessee to withhold rental or to rescission.

The same general remarks are applicable to the proceedings in the suit of Roosevelt and Fosdick. They are receivers of the income, rents, issues, and profits which are due and owing by the lessee corporation under and pursuant to the provision of the lease. They have not yet disturbed the possession of the lessee, and at present they are under instructions not to do so. They are asserting, for the bondholders, and as to the income and profits of the leased property, only such rights as the Columbus, Chicago and Indiana Central Railway Company claims to have under the original and amended lease. The possibility, during the term of the lease and pending proceedings for the consummation of the agreements between the parties, of such suits as those instituted by Pullan, Roosevelt and Fosdick must have been in the minds of the parties when the lease and amended lease were executed. Nothing which has occurred in those suits, up to the present time, would justify rescission.

Fifth—On behalf of complainant it is further claimed—

That the covenant to reduce and classify the mortgage indebtedness of the lessor company and the covenant of the lessee to pay and apply the stipulated rent are dependent, the former being a condition precedent, the performance of which must be alleged and shown before any liability can be enforced against the lessee, and the continued failure to perform which gives to the latter a right to rescind the agreement and cancel the lease;

That even if this covenant is not technically at law a condition precedent to the performance of the covenants of the lessee, it is, in equity, one which, coupled with the insolvency of the lessor, the lessee is entitled to have specifically performed, or, failing in that, to have the lease rescinded and canceled.

These two propositions may be considered together.

"The rule has been established, by a long series of adjudications in modern times, that the question whether covenants are to be held dependent or independent of each other is to be determined by the intention and meaning of the parties as it appears on the instrument, and by the application of common sense to each particular case, and to which intention, when once discovered, all technical forms of expression must give way." This language from Stavers v. Curling, 3 Bing. N. C. 368, is cited with approval in Lowber v. Bangs, 2 Wall. [69 U. S.] 736, where the following was added: "Rules have been elaborately laid down and discussed in many cases for determining the legal character of covenants and their relations to each other; but all the leading authorities concur in sustaining these propositions. Contracts, where their meaning is not clear, are to be construed in the light of the circumstances surrounding the parties when they were made, and the practical interpretation which they, by their conduct, have given to the provisions in controversy."

Guided by these established rules, I am of opinion that the covenant on the part of the lessor corporation, "to arrange, provide for, and so adjust and classify all their indebtedness now (then) existing, that $15,821,000 thereof shall be represented by bonds bearing 7 per cent. interest," secured by mortgage upon the estate and property of the lessor, is not technically a condition precedent to the performance by the lessee corporation of its covenant to pay the stipulated rent. The language employed by the parties, in the light of attendant circumstances, and in view of what, in time and labor, was plainly necessary to be done in order that the indebtedness of the lessor corporation might be arranged, provided for, adjusted, and classified, as required by the amended lease, renders it perfectly certain that the lessee remaining in possession, and enjoying the fruits of the lease, was not entitled to withhold payment of the stipulated rent until the adjustment and classification were accomplished. Such was the practical interpretation given by the lessee company to the contract. It did not, after the execution of the amended lease, withhold the stipulated rent, but promptly and regularly paid, up to the commencement of this litigation, such annual rent as it conceded to be due according to the terms of the original and amended lease. It was clearly the expectation of the parties that the lessee should pay the stipulated rent, pending such steps as the lessor corporation, exercising due diligence, might be required to take in order to comply with its covenant to arrange, provide for, adjust, and classify its indebtedness.

But it does not follow from all this that the lessee company is bound to wait for an indefinite or an unreasonable time for such arrangement, adjustment, and classification of the lessor's indebtedness to be effected. The stipulation, in the amended lease, upon that subject, is obviously matter of substance, not mere form. It constituted, beyond question, a very material part of the consideration for the amended lease. It would not, as I infer, have been executed by the lessee corporation without the covenant upon the part of the lessor company to arrange, provide for, adjust and classify its indebtedness to the extent stipulated. The parties by their contract have made that stipulation material, and it is not for the court to decline to give it effect according to the fair and reasonable interpretation of the words employed. What then did the parties mean by the words in the amended lease, "to arrange, provide for, and so adjust and classify." Some light is thrown upon this question by the first item of the fourth resolution passed by the lessor's board of directors at the time they determined to issue and negotiate $10,000,000 of convertible bonds for the following purposes: "First, to take up, retire, and cancel so much of all the bonded indebtedness now existing, prior in date to these presents, against the company (made by it or made by any company merged in this company by consolidation) as that the said bond indebtedness shall be reduced to $15,821,000, leaving outstanding of the present existing bonded debt, the $15,000,000 first mortgage bonds of the company and $821,000 of the second mortgage bonds of the Columbus and Indianapolis Central Railway Company." The same idea is expressed in the proviso to the second resolution of the board, which declares that "so much of said interest fund as, in the opinion of this company, may be necessary for that purpose, may, from time to time, be used in adjusting the present outstanding bonds of the company, and other companies merged in this company by consolidation, so as to make the bonded debt of this company conform to the agreement by which said bonded debt is to be reduced to $15,821,000, as provided in the first item of the fourth resolution of this board."

The lessor's indebtedness has not been arranged, provided for, adjusted, and classified, as required by the amended lease. When this bill was filed it had made very little progress in that direction. Before this suit was commenced it was twice notified by the lessee corporation that the provision in the contract requiring such adjustment and classification was insisted upon, and compliance therewith demanded. There are, no doubt, many difficulties in the way of com-

pliance. But the court cannot, upon that ground, discharge the lessor from the obligation of compliance. It has no right to make contracts for parties. Its duty is to construe and enforce those made.

The lessee corporation insists that the lessor has been guilty of such delay in performing its covenants that it has now the right to a decree of rescission. That is not the theory upon which compliance with the amended lease was demanded, nor upon which the bill was framed, nor would such a decree, at this time, be just or equitable. The notice given by the lessee, under date of October 27, 1874, was that unless the amended lease was complied with, legal proceedings would be instituted to compel specific performance. The subsequent notice was to the same effect. The bill prays for a rescission and an account, and that the lessor corporation resume possession of the railroad and other demised property, free, and discharged from the lease, "unless the defendant shall, within some reasonable time to be fixed by the court, specifically perform its said covenant aforesaid, and arrange, adjust, and classify, and fund its said indebtedness, as by the terms of said agreement of February 1, 1870, it is bound to do." It would be inconsistent with the whole frame of the suit to do more at this time than to decree a performance of the agreement by the lessor.

To such a decree the complainant in the original bill seems to be equitably entitled, but is not now entitled to more. The lessor company was in such financial condition at the commencement of this action that the complainant is justified in insisting that there shall be no further delay in the required adjustment of the lessor's bonded indebtedness. The time has come in the history of both the lessor and lessee companies when the latter is entitled to have it definitely ascertained whether the terms of the original and amended lease are to be complied with. Upon the question as to what time should be given to the defendant within which to comply with its covenant, I have had some difficulty. Too little consequence is attached by the lessor company to the time which elapsed from the execution of the amended lease to the date of the notice given in October, 1874, and too much consequence is attached by complainant to the lapse of time from that date to the submission of this cause. Under all the circumstances I have concluded that the lessor corporation may have until the 1st day of January next, within which to arrange, provide for, adjust, and classify its indebtedness, as required by the amended lease of February 1, 1870, and in default thereof the complainant has leave to move for a decree rescinding the contract between the parties, upon such terms, and with such provisions for a settlement of accounts as may be equitable.

It will be observed that I have said nothing upon the point earnestly discussed by counsel

as to the rights of bondholders against the Pittsburg, Cincinnati and St. Louis Railway Company and the Pennsylvania Railroad Company, by reason of the guaranty given by the latter, and by reason of the published letter signed by the president of both companies at or about the date of the actual execution of the amended lease. I have omitted any consideration of that question because, in my judgment, it is not necessarily involved in the issues made in this case. What may now be the rights of such bondholders as against those companies, or what may be their rights in the event of a rescission of the contract of leasing, need not, and indeed cannot properly, be determined in this case. That may be the subject of distinct litigation between them and such companies, or either of them. The right of the complainant to a rescission as between it and the lessor corporation, is not affected by the obligation, if any, of the complainant, or of its guarantor, to pay the bonds issued or purchased upon the faith of the leases, and of the letter issued in December, 1874. I make no expression of opinion as to whether such obligation exists upon the part either of complainant or its guarantor.

Counsel may prepare such order as may be necessary to give effect to this opinion, and such further orders as may be necessary for the preparation of the cause for final hearing upon all issues not now disposed of.